Ryan M. Nord (11140)
**SAGE LAW PARTNERS, LLC.**
140 North Union Ave, Suite 220
Farmington, Utah 84025
Telephone: (801) 438-7120
Facsimile: (801) 438-7121
rnord@sagelawpartners.com
Attorneys for Plaintiff

---

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **LIFETECH PHARMA, LLC**; <br><br> Plaintiff, <br><br> vs. <br><br> **MASTER SMITH ENTERPRISES, LLC; ANTHONY RUSSELL SMITH; SMITH SYSTEMS, LLC; ERTAN AYDINOL; SHARMA RAMNARINE; SHIVHEM ENTERPRISES; and DOES 1-50,** <br><br> Defendants. | **COMPLAINT** <br><br> **AND JURY DEMAND** <br><br><br> Civil No. _____ <br><br> Judge: _____ |

Plaintiff LifeTech Pharma, LLC ("Plaintiff" or "LifeTech") complains against Master Smith Enterprises, LLC, Anthony Russell Smith, Smith Systems, LLC, Ertan Aydinol, Sharma Ramnarine, ShivHem Enterprises, and Does 1-50 as follows. Master Smith Enterprises, LLC, Anthony Russel Smith, Smith Systems, LLC, Ertan Aydinol, Sharma Ramnarine, ShivHem Enterprises may be referred to collectively as "Defendants."

### PARTIES, JURISDICTION, & VENUE

1. Plaintiff is a Wyoming limited liability company with a principal place of business in Utah.

2. Defendant Master Smith Enterprises, LLC ("MSE") is a Colorado limited liability company.

3. Defendant Smith Systems, LLC ("SS") is a Colorado limited liability company.

4. Defendant Anthony Russell Smith ("Smith") is an individual who resides in and is a citizen of Colorado.

5. Upon information and belief, Smith is the sole member of MSE and SS.

6. Defendant Ertan Aydinol ("Aydinol") is an individual who resides in and is a citizen of Colorado.

7. ShivHem Enterprises, LLC ("ShiveHem") is an unregistered or expired assumed or fictitious name of Sharma Ramnarine.

8. Upon information and belief, Sharma Ramnarine ("Ramnarine") is an individual who resides in and is a citizen of Texas.

9. This lawsuit arises out of transactions involving the solicitation of an equipment order in Utah, communications made to Plaintiff in Utah, delivery of equipment to Utah, and the failure to perform activities including installation and modification of the equipment in Utah.

10. Does 1-50 are persons who participated in the torts and omissions and commissions with the Defendants, but whose identities are not currently known.

11. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

12. In addition, this action arises under, *inter alia*, 18 U.S.C. § 1962.

13. LifeTech, MSE, SS, Smith and Aydinol entered into an agreement under which they

agreed that the state or federal courts in Salt Lake County, Utah would be the sole and exclusive forum for the resolution of any disputes related to the agreement that is the subject matter of this lawsuit.

14. LifeTech, MSE, SS, Smith and Aydinol entered into an agreement under which they agreed to submit to the jurisdiction of the state or federal courts in Salt Lake County, Utah for the resolution of any disputes related to the agreement that is the subject matter of this lawsuit.

15. This Court is the proper venue.

## GENERAL ALLEGATIONS

**a.    Background**

16. Aydinol approached Zack Bybee of LifeTech in Utah about a business idea about extracting hemp biomass into crude oil.

17. Aydinol, who was in Colorado, called Bybee, who was in Utah, to discuss this.

18. Aydinol and Bybee also exchanged text message about this.

19. Aydinol represented to Zack Bybee that he had contracts in place for end users to purchased isolates and could not refine as much hemp as needed to keep up with his many contracts.

20.  In March 2019, Zack Bybee met with Aydinol and Smith in Colorado at the MSE/SS facility to discuss this in more detail (and then transitioned during the meeting to Smith's home, also in Colorado).

21. During that meeting, Aydinol and Smith stated that they could provide manufacturing equipment within 30 days from ordering, that if Lifetech purchased the equipment  and they had

contracts in place for hemp processing that would keep the machines busy full time for at least two years.

22. During that meeting, Smith stated that he had a "bottleneck" on extraction in fulfilling contracts he had, that his specialization was refining crude into distillate and then refining the distillate into isolates, and that he had more contracts for the purchase of isolates than he could fulfill.

23. During that meeting, Smith showed Zack Bybee six to eight contracts for biomass extraction that Smith said would keep the equipment busy for at least two years.

24. Upon information and belief, the contracts were either fabricated, not binding, or were not for what Smith represented they were.

25. Smith and Aydinol failed to disclose that the contracts were for less than a year and that, as of the meeting, only had a remining term of less than five months.

26. In late March 2021, Zack Bybee, Taylor Yates (of LifeTech), Smith and Aydinol met again in Colorado at Smith's home.

27. During that meeting, Aydinol and Smith reiterated the same representations they had made a couple of weeks prior.

28. They stated that they could provide manufacturing equipment within 30 days from ordering, that if Lifetech purchased the equipment, they had contracts in place for hemp processing that would keep the machines busy full time for at least two years.

29. During that meeting, Smith stated that he had a "bottleneck" on extraction in fulfilling contracts he had, that his specialization was refining crude into distillate and then refining the

distillate into isolates, and that he had more contracts for the purchase of isolates than he could fulfill.

30. During that meeting, Smith stated that he had enough contracts to keep the equipment busy on a full-time basis for at least two years.

31. During that meeting, Smith showed Zack Bybee six to eight contracts for biomass extraction that Smith said would keep the equipment busy for at least two years.

32. Upon information and belief, the contracts were either fabricated, not binding, or were not for what Smith represented they were.

33. Smith and Aydinol failed to disclose that the contracts were for less than a year and that, as of the meeting, only had a remining term of less than five months.

34. Then, Zack Bybee, Taylor Yates (of LifeTech), Shane Scott, Smith and Aydinol met again in Colorado at Smith's home to discuss the equipment and hemp processing.

35. During that meeting, Aydinol and Smith reiterated the same representations and assurances they had made at the prior two meetings.

36. Originally, the parties agreed on equipment that would include processing hemp into crude oil and then refining the crude oil into isolates.

37. But they subsequently agreed that the equipment to be purchased would be limited to extraction equipment that would extract biomass into crude oil.

38. During these three meeting, Zack Bybee asked specifically about the functionality of the machines and how they would work.

39. During these meetings, Smith and Aydinol also represented that they had sold and

installed the same or similar machines to other processers.

40. Smith and Aydinol represented that these other machines sold to other processers functioned and worked as they represented they would for LifeTech.

41. LifeTech has since learned that these representations were false.

42. Upon information and belief, Defendants did not sell the same machines to others.

43. Further, upon information and belief, the machines sold by Defendants to others did not work as represented, were not compatible with United States laws, and had to be heavily retrofitted in order to function.

44. Prior to Lifetech agreeing to purchase the equipment, Smith and Aydinol represented to LifeTech that the equipment:

      a.      Would be capable of processing 200 pounds per hour each for a total of 400 pounds per hour between the two machines;

      b.      Would comply with the applicable United States laws, regulations, and safety standards;

      c.      That they had contracts in place to keep the machines operating at full capacity at $25 per pound;

      d.      That they had sold and installed the same or similar equipment multiple times and that those machines were performing as they represented these machines would perform.

45. None of these representations were true.

46. Further, Defendants did not provide what was ordered.

47. Defendants were supposed to provide two boilers, but instead sent one larger boiler.

48. The boiler does not fit in the space prepared for it.

49. The large boiler they provided was used and very old.

50. Defendant stated to Plaintiff that new boilers suitable for Plaintiff's needs were not available and that is why they had to provide a used boiler.

51. This is not accurate.

52. Boilers suitable for Plaintiff's purposes were in stock and available for purchase.

53. Plaintiff never agreed to accept one boiler or a used boiler.

54. Further, Defendants were required to provide two air compressors.

55. But Defendants only provide one air compressor.

56. The air compressor is used.

57. The air compressor is over twenty years old.

58. Defendants agreed to provide engineering for the equipment, but never did.

59. Defendants represented that the Equipment would meet U.S. and local laws and regulations.

60. In order to induce Plaintiff to purchase the equipment, Defendants represented that they would provide 50,000 pounds of biomass processing work to Plaintiff per month at $25/pound for two years.

61. In order to induce Plaintiff to purchase the equipment, Defendants represented that they had biomass contract in place in order to allow Defendants to fulfill the Equipment production capacity and that they would provide this biomass processing work to Plaintiff at

$25/pound.

**b.    Equipment Purchase and Untimely Delivery**

62. LifeTech contracted with MSE and paid over $1,740,000.00 to provide LifeTech with two large capacity ethanol extraction units and related equipment (the "Equipment").

63. Smith and Aydinol stated the Equipment would be delivered within 30 days of ordering.

64. In reliance on the agreement and Defendants' representations about the delivery date, Plaintiff rented and prepared a temporary facility, and also leased a building and remodeled it to accommodate the Equipment.

65. In reliance on the agreement and Defendants' representations about the delivery date, Plaintiff entered into contracts with third parties to provide extraction services.

66. LifeTech provided the 60% deposit in the amount of $1,162,320.00 by interstate wire transfer on 07/03/2019.

67. Per Smith's direction, the wire was sent to SS.

68. The ethanol extraction units were being sourced from China.

69. Both Smith and Aydinol subsequently stated to LifeTech that the manufacturing of the Equipment was running behind, but that an additional 30% in deposit funds would secure expedited delivery of the Equipment.

70. Both Smith and Aydinol represented to LifeTech that if the additional payment was made, the Equipment would be shipped on the next shipment, i.e. within one to two weeks.

71. In exchange for Smith and Aydinol's representation that the Equipment would be

shipped on the next shipment, i.e. within one to two weeks, LifeTech agreed to accelerate the payment schedule to pay an additional 30% prior to delivery.

72. LifeTech, both before agreeing to purchase the Equipment, and also when agreeing to accelerate the payments, communicated with Defendants about the time sensitivity of the delivery of the Equipment, the contracts LifeTech intended to fulfill, and the need for timely delivery.

73. In further reliance on Defendants' representations about the timing of the delivery of the Equipment, LifeTech provided Smith Systems with an interstate wire transfer in the amount of $581,160.00 on 07/25/2019.

74. But the Equipment was not delivered within one to two weeks.

75. Further, the Equipment was not delivered by the September, 2019 deadline.

76. The primary units were not delivered until December 26 and 27, 2019.

77. But to date, the units have not been fully delivered and installed.

78. On October 11, 2019, Aydinol provided LifeTech with a bill of lading by way of text message sent to LifeTech in Utah.

79. The bill of lading showed the Equipment had shipped on 10/20/2019.

80. But the bill of lading was fabricated and forged by Defendants.

81. The shipping company referenced on the bill of lading confirmed it never issued the purported bill of lading.

82. LifeTech contacted the purported freight company, Sun Track Express (Monterey Park, CA), which informed LifeTech that no such bill of lading had been issued from their agents

and or agency.

83. Further, MSE has asserted that the delay was caused by ShivHem misappropriating the money paid for the extraction equipment.

84. LifeTech has asked for additional information about this, but has not received it.

85. Further, Defendants have now acknowledged that at least a portion of the money paid by LifeTech was used to pay for tariffs for other equipment for either Defendants or other customers.

### c. Losses from Untimely Delivery

86. The delay in delivery of the Equipment caused LifeTech losses of at least $1,950,000 from failure to execute on contracted extraction business in the form of processing 100,000 pounds of hemp at $25 per pound.

87. The delay in delivery of the Equipment also caused LifeTech losses of at least $13,110,000 from failure to demonstrate possession of the extraction machines with its customer METT.

88. Also, LifeTech has processed 35,621 pounds at $13/pound, but has had to outsource this work.

89. After outsourcing, LifeTech has made $3.50/pound, whereas it would have made $11/pound if it would have been able to use the equipment to process it.

90. Therefore, Lifetech lost $7.50 per pound in profits, which results in $267,157.50 in lost profits.

91. Also, in anticipation of receiving the units in September, LifeTech set up a temporary

production facility, which costs have gone to waste as the facility has sat idle while waiting for delivery of the units.

92. LifeTech incurred costs for that temporary production facility through the date of this letter, including rent, build out costs, utilities, and wages totaling over $943,504, all of which have been wasted based on the failure to timely deliver the Equipment.

93. Upon information and belief, Defendants had a disincentive to timely deliver because Smith was receiving payment related to the outsourcing of extraction work to METT.

94. Smith failed to disclose that he was receiving payment from METT while Plaintiff used METT as an alternative temporary solution to producing with the Extraction Equipment that was delayed and then non-functional upon delivery.

**d. Losses from Lost Extraction Work To Be Provided by Defendants**

95. Further, Defendants agreed to provide 50,000 pounds of biomass per month at $25/pound for two years.

96. This equates to $1,250,000 per month for a total of $30,000,000.

97. This was modified through amendment to 125,000 pounds at $15/pound, which equates to $1,875,000/month for 24 months for a total of $45,000,000.

98. Defendants then breached this agreement and failed to fulfil the delivery of this biomass.

99. Defendants used the promise of biomass delivery to induce LifeTech to purchase the Equipment, with no intent of fulfilling that portion of the contract and no reasonable prospects of doing so.

100.     Defendants used the promise of biomass delivery to induce LifeTech to purchase the Equipment, but Plaintiff has now learned Defendants did not have extraction contracts in place in order to allow them to fulfill that obligation.

**d. Defective Equipment and Further Failure to Perform**

101.     Defendants have failed to install and set up the Equipment.

102.     In addition, the Equipment is defective and not as represented, including but not limited to:

a.     The motors are not compliant with OSHA laws and other regulations;

b.     The pumps are not properly matched for the machinery;

c.     The Equipment has to be modified;

d.     The Equipment does not meet the performance specifications represented by Defendants;

e.     The boiler is one large, used unit instead of two new units;

f.     The air compressor is used instead of new;

g.     The Equipment has not been installed by Defendants; and

h.     Defendants have failed and refused to provide engineering for the Equipment.


103.     The boilers and compressor have not been exchanged.

104.     In addition to the deficiencies listed above (boilers, compressors, motors, pumps), upon information and belief the Equipment does not have the capacity specified and represented

by Defendants.

    **e.**    <u>**Revised Purchase Agreement**</u>

105.    On or about March 9, 2020, LifeTech, MSE, SS, Smith and Aydinol

entered into a Revised Purchase Agreement (the "Revised Agreement").

106.    In that Revised Agreement, MSE, SS, Smith and Aydinol agreed to:

    a.    Install and reconfigure all installation of all Equipment and replace any parts or components so that all Equipment will:
        i. meet all OSHA safety standards.
        ii.  meet all federal, state and local regulations, laws, engineering standards and requirements;

    b.    Arraignment and process flow (P&ID) of all equipment shall be designed and reviewed by a Utah Licensed Professional selected by LifeTech at Sellers' expense. A stamped report will be provided to Lifetech Pharma on the suitability and safety of the system.

    c.    Boilers, air compressors, and all other support equipment will be installed by a licensed professional within the state of Utah.

    d.    The V2 Extraction system installation, operation, and performance must be certified by a third party licensed professional within the state of Utah selected by LifeTech at Sellers' expense. A stamped report will be provided to Lifetech Pharma before the systems will be accepted.

    e.    The V2 system must be able to process 300 lbs of hemp per hour or modified to accomplish said quantity.

    f.    The installation of an additional 200 litter centrifuge to one of the V2 systems must be done in accordance with federal, state and local engineering standards and requirements. Its arraignment, process flow (P&ID), installation, operation, and performance must be certified by a third party licensed professional within the state of Utah selected by LifeTech at Sellers' expense. A stamped report will be provided to Lifetech Pharma before the systems will be accepted. Its installation and operation must not hinder the performance of the original system.

g.      Ensure that all Equipment meets or exceeds the requirements of the Purchase Agreement, except as modified by this Revised Agreement. To the extent there is a conflict between the Equipment requirements of the Purchase Agreement and the Revised Agreement, the Revised Agreement's terms will control.

h.      There is a comprehensive "bumper to bumper" warranty from Sellers on all Equipment for one year (the "Warranty Period") after completion of all requirements of paragraph 1(a-g) of this Revised Agreement.

i.      Customer service.  Sellers' engineer will train LifeTech's personnel after completion of all requirements of paragraph 1(a-g) of this Revised Agreement through the Warranty Period.

j.      Parts closet.   Sellers will provide warehouse parts of whole systems including seal rings and mechanical seals for each unit, as well as added kit, pump, vacuum pump valves, and wear and tear parts during the Warranty Period.

107.    MSE, SS, Smith and Aydinol did not perform the obligations listed in the preceding paragraph.

108.    MSE, SS, Smith and Aydinol also agreed to provide $250,000 of post-refinement work, but failed to do so.

109.    The agreement that the Revised Agreement supersedes prior agreements and application of the releases in the Revised Agreement were contingent on full and timely performance of MSE, SS, Smith and Aydinol.

110.    MSE, SS, Smith and Aydinol did not perform all of their obligations under the Revised Agreement.

111.    LifeTech has been damaged by their failure to perform under the Revised Agreement.

**f.      Damages Summary**

112.    Asa a result of Defendants' actions, Plaintiff has incurred the following damages:

a.      $1,950,000 from a lost customer contract;

b.      $13,110,000 from a lost customer contract;

c.      $267,157.50 from lost profits from outsourcing processing;

d.      $943,504 in wasted facility and set up expenses;

e.      $30,000,000 from lost extraction, or alternatively $5,000,000 from lost extraction to be provided by Defendants;

f.      Costs of engineering and installation of the Equipment in an amount to be determined at trial;

g.      Costs to modify the Equipment in an amount to be determined at trial;

h.      $37,125 per month in rent and $3,970 per month in CAMS on an ongoing basis; and

i.      $250,000 in post-refinement work under the Revised Agreement.

<u>**FIRST CAUSE OF ACTION**</u>
**Breach of Contract—Original Purchase Agreement- MSE**

113.    LifeTech realleges and incorporates herein each of the averments set forth above.

114.    LifeTech and MSE entered into an agreement under which MSE agreed to sell the Equipment to Plaintiff.

115.    LifeTech performed under the agreement.

116. MSE breached the agreement by, *inter alia*, failing to timely deliver the Equipment, failing to install the Equipment, and failing to provide Equipment that met the required specifications and that complied with applicable laws and regulations.

117. Plaintiff has been harmed by MSE's breaches, in an amount to be established at trial.

## SECOND CAUSE OF ACTION
### Breach of Contract—Revised Purchase Agreement-MSE, Smith, SS, and Aydinol

118. LifeTech realleges and incorporates herein each of the averments set forth above.

119. LifeTech and MSE, Smith, SS, and Aydinol entered into an agreement under which MSE agreed to deliver and complete the installation of extraction equipment, among other items.

120. LifeTech performed under the agreement.

121. MSE, Smith, SS, and Aydinol breached the agreement by, *inter alia*, failing to timely deliver the Equipment, failing to install the Equipment, and failing to provide equipment that met the required specifications and that complied with applicable laws and regulations.

122. Plaintiff has been harmed by MSE, Smith, SS, and Aydinol's breaches, in an amount to be established at trial.

## THIRD CAUSE OF ACTION
### Unjust Enrichment-All Defendants

123. LifeTech realleges and incorporates herein each of the averments set forth above.

124. Defendants received funds that are the property of LifeTech.

125. Therefore, Defendants have been unjustly enriched.

126. LifeTech is entitled to recover from Fraud Defendants in an amount to be established at trial.

## FOURTH CAUSE OF ACTION
### Constructive Trust-All Defendants

127. LifeTech realleges and incorporates herein each of the averments set forth above.

128. Defendants would be unjustly enriched if they were permitted to retain LifeTech' funds.

129. Defendants hold LifeTech's funds subject to a constructive trust in favor of LifeTech, and are subject to an equitable duty to deliver the funds to LifeTech.

130. Wherefore, the Court should enter judgment (i) declaring and recognizing that the LifeTech' funds and any assets traceable to LifeTech' funds are held subject to a constructive trust in favor of LifeTech, and (ii) requiring the Defendants to pay-over the funds to LifeTech.

## FIFTH CAUSE OF ACTION
### RICO-18 U.S.C. § 1962(c and d)-All Defendants

131. LifeTech realleges and incorporates herein each of the averments set forth above.

132. Defendants are capable of holding a legal or beneficial interest in property and are, therefore, each a "person" within the meaning of 18 U.S.C. § 1961(3).

133. The continuing association formed by these parties constitutes a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).

134.    The Defendants, intentionally acting in concert, have unlawfully, fraudulently, and intentionally conspired together to violate 18 U.S.C. § 1962(c) and to plan and perpetrate a fraudulent scheme to carry out the enterprise, which is a RICO enterprise as described above.

135.    From 2018 and continuing through to the present, the Defendants, acting in concert, have unlawfully, knowingly, and intentionally conducted and participated, and continue to conduct and participate, in the affairs of Equipment Fraud Enterprise, through a pattern of racketeering activity that includes devising and intending to devise and execute a scheme and artifice to defraud and to obtain money or property by means of false and fraudulent pretenses, representations, and promises, through the use of U.S. Mails, private or commercial interstate carriers and through the use of interstate wires and radio communications, as well as through interstate travel.

136.    This racketeering activity was performed by the Defendants in furtherance of their scheme to: (1) misrepresent and/or conceal information about the equipment and the shipping of the equipment; (2) misrepresent and/or conceal information about their relationships with each other; (3) deceive and defraud LifeTech to turn over money; and (4) execute agreements and documents with LifeTech that were obtained by fraud.

137.    The Defendants have violated 18 U.S.C. § 1962(c), by conducting or participating in the conduct of the enterprise's affairs through a pattern of unlawful activity.

138.    The Defendants, acting in concert, have unlawfully, willingly, and knowingly used the U.S. mails, private or commercial interstate carriers, and interstate wires in furtherance

of their scheme and artifice to defraud LifeTech and the deprive it of its property rights including.

139.     In multiple conversations and in written communications using interstate wire communications between 2018 through 2020, Defendants made the misrepresentations listed above.

140.     In addition, Defendants conducted interstate travel and induced other to travel interstate in furtherance of their enterprise.

141.      The Defendants, acting in concert, have unlawfully, knowing and intentionally engaged in two or more acts indictable under the Federal Mail Fraud Statute, 18 U.S.C. § 1341, the Federal Wire Fraud Statute, 18 U.S.C. § 1343, and have therefore intentionally engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B).

142.     As a direct and proximate result of the Defendants' acting in concert and their willful and unlawful participation in and conduct of the Equipment Fraud Enterprise, through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), LifeTech suffered injury in fact and has lost money and/or property.

143.     Pursuant to 18 U.S.C. § 1964, LifeTech is entitled to damages, including treble damage, for the injuries and are entitled to costs of the suit, including reasonable attorney fees.

144.     In addition, the Defendants, intentionally or recklessly, acting in concert, have unlawfully, fraudulently, and recklessly intentionally conspired to: (1) misrepresent and/or conceal information regarding the true nature of and viability of the Equipment, including but not limited to the actual processing capability of the Equipment, the shipping and availability of

the Equipment, the nature and viability of other equipment sold or purported to be sold by Defendants, the lack of productivity of other equipment sold by Defendants, the incompatibility of the Equipment with applicable laws and regulations, and processing contracts and capacity Defendants had; (2) mispresent or conceal information regarding Defendants' relationship with each other and the company LifeTech has used in the interim to process hemp; (3) deceive and defraud LifeTech to invest in the Equipment and accelerate payments; and (4) execute and seek to enforce agreements with LifeTech that were obtained by fraud.

145.    As a direct and proximate result of the Defendants' wrongful and unlawful actions described herein, LifeTech has sustained actual damages, and will continue to incur such damage on an ongoing and continuing basis.

**SIXTH CAUSE OF ACTION**
**Fraud- All Defendants**

146.    LifeTech realleges and reincorporates herein each of the averments set forth above.

147.     Between 2018 to 2020,  Defendants made statements to LifeTech and/or its representatives as listed above.

148.    Defendants made these representations with the intention to deceive and defraud LifeTech and to induce LifeTech to invest in the equipment at issue and to create facilities and enter into contracts in anticipation of receipt of the equipment.

149.    Each of the Defendants knew that these representations were false, or were reckless regarding the veracity of the representations.

150.	Each of the Defendants also concealed from LifeTech additional material facts as listed above, including the fact that:

        a.	The Equipment did not have the capacity to process the amount of hemp represented;

        b.	The same or similar equipment sold by Defendants to others did not have the ability to process the amount of hemp represented;

        c.	Defendants did not have contracts for the processing of hemp or did not have the amount of contracts they represented;

        d.	Defendants were not capable of delivering the Equipment when promised;

        e.	Defendants were not capable of providing processing amounts as promised;

        f.	The bill of lading was forged or fabricated; and

        g.	The Equipment had not shipped when represented.

151.	Each of the Defendants knew that LifeTech was relying on the representations in deciding to invest in the equipment, rent and prepare a temporary facility, enter into a lease and make improvements for the production facility, and enter into contracts with third parties to provide extraction services.

152.	As a proximate result of Defendants' material misrepresentations and omissions, LifeTech was induced to invest in the Equipment, rent and prepare a temporary facility, enter into a lease and make improvements for the production facility, and enter into contracts with third parties to provide extraction services.

153.     Had LifeTech known that Defendants had lied and omitted material facts concerning the Equipment, LifeTech would not have invested in the Equipment, rented and prepared a temporary facility, entered into a lease and made improvements for the production facility, and entered into contracts with third parties to provide extraction services.

154.     As a result of Defendants' fraud, LifeTech has been damaged in an amount to be proven at trial.

155.     Each of the Defendants is liable because they participated directly in the fraud and/or aided and abetted in the fraud.

156.     In the alternative, LifeTech is entitled to rescind any agreements under which LifeTech conveyed money to the Defendants and is entitled to a return of the money conveyed to the Defendants.

**SEVENTH CAUSE OF ACTION**
**Negligent Misrepresentation-All Defendants**

157.     LifeTech realleges and reincorporates herein each of the averments set forth above.

158.      Between 2018 to 2020,  Defendants made statements to LifeTech and/or its representatives concerning, among other things:

a.     The Equipment had the capacity to process the amount of hemp represented;

b.     That the same of similar equipment sold by Defendants to others had the ability to process the amount of hemp represented;

      c.      Defendants had contracts for the processing of hemp to keep the Equipment busy for two years;

      d.      Defendants were capable of delivering the Equipment when promised;

      e.      Defendants were capable of providing processing amounts as promised;

      f.      The bill of lading was accurate, real, and properly issues when it was actually fabricated; and

      g.      The Equipment had shipped when represented.

159.     These representations were false.

160.     Defendants made these representations with reckless disregard as to the representations' falsity.

161.     LifeTech believed these representations to be true.

162.     LifeTech justifiably relied on Defendants' representations in agreeing to invest in the equipment, rent and prepare a temporary facility, enter into a lease and make improvements for the production facility, and enter into contracts with third parties for extraction services.

163.     As a proximate result of Defendants' misrepresentations, LifeTech has been damaged in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Conspiracy-All Defendants

164.     LifeTech realleges and incorporates herein each of the averments set forth above.

165.     Upon information and belief, each of the Defendants agreed among themselves that one or more of them would make material misrepresentations to and/or omit and conceal material information from LifeTech for the Defendants' collective benefit.

166.     Each of the Defendants intended to and did receive a financial benefit from LifeTech, as described in more detail above.

167.     In addition to making misrepresentations and omissions, each of the Defendants took additional concrete steps in furtherance of the conspiracy, including: (1) executing an agreement with LifeTech that was obtained by fraud; (2) making promises and representations to LifeTech about the Equipment; (3) making promises and representation about the delivery and shipment of the Equipment; (4) making misrepresentations about the amount of extraction contracts it had and could provide to LifeTech.

168.     Based on the conspiracy, all Defendants are jointly and severally liable for all damages asserted herein.

## NINTH CAUSE OF ACTION
### Declaratory Judgment-Revised Purchase Agreement

169.     LifeTech realleges and incorporates herein each of the averments set forth above.

170.     The releases in the Revised Purchase Agreement are contingent on full and timely performance by MSE, SS, Smith and Aydinol.

171.     The provision in the Replacement Agreement that it supersedes prior agreements is contingent on full and timely performance by MSE, SS, Smith and Aydinol.

172.     MSE, SS, Smith and Aydinol did not timely and fully perform under the Revised Purchase Agreement.

173.     Therefore, paragraphs 4a and 4b of the Revised Purchase Agreement are voidable.

174.     LifeTech request a declaration that paragraphs 4a and 4b of the Revised Purchase Agreement are void and unenforceable.

**TENTH CAUSE OF ACTION**
**Conversion-All Defendants**

175.     LifeTech realleges and incorporates herein each of the averments set forth above.

176.     Defendants, acting individually and in concert, intentionally exercised (and/or intentionally directed, participated in, sanctioned, cooperated in, and/or otherwise caused others to exercise) dominion and control over the property of the LifeTech in a manner inconsistent with the rights of LifeTech.

177.     Defendants, acting individually and in concert, wrongfully converted the property of the LifeTech and/or intentionally directed, participated in, sanctioned, cooperated in, and/or otherwise caused others to convert the property of the LifeTech.

178.     Upon information and belief, the above-described conduct of the Defendants manifests a knowing and reckless indifference toward, and a disregard of, the rights of LifeTech.

179.     As a direct and proximate result of the Defendants' tortious conduct, LifeTech has suffered injury and damages in an amount to be established at trial, and LifeTech is entitled to judgment for such, including for punitive damages.

## ELEVENTH CAUSE OF ACTION
### Money Had and Received-All Defendants

180.    LifeTech realleges and incorporates herein each of the averments set forth above.

181.    Defendants received money that was intended to be used for the benefit of LifeTech.

182.    That money was not used for the benefit of LifeTech.

183.    Defendants have not given the money to LifeTech.

184.    Therefore, LifeTech is entitled to judgment against Defendants in an amount to be established at trial.

## TWELFTH CAUSE OF ACTION
### Breach of Warranty-All Defendants

185.    LifeTech realleges and incorporates herein each of the averments set forth above.

186.    Defendants provided express and implied warranties to Lifetech regarding the Equipment, including that it would be fit for its particular purpose, would comply with all applicable laws and regulations, and would process hemp at 400 pounds per hour and at an optimal rate of 200 pounds per hour.

187.    Defendants breached these express and implied warranties regarding the equipment.

188.    Therefore, LifeTech is entitled to judgment against Defendants in an amount to be established at trial.

**THIRTEENTH CAUSE OF ACTION**
**Colorado Organized Crime Control Act-MSE, SS, Smith and Aydinol**

189.    LifeTech realleges and incorporates herein each of the averments set forth above. At all relevant times, MSE, SS, Smith and Aydinols were persons within the meaning of Colo. Rev. Stat. § 18-17-103(4).

190.    At all relevant times, Defendants acted as an "enterprise" within the meaning of Colo. Rev. Stat. § 18-17-103(2).

191.    At all relevant times, Defendants were associated with each other.

192.    As alleged above, beginning in 2018, Defendants concocted, orchestrated, and directed the fraudulent and illicit scheme set forth in this Complaint through a pattern of racketeering activity as defined in Colo. Rev. Stat. § 18-17-103(3), (5), including numerous incidences of civil theft, mail fraud, and wire fraud.

193.    Defendants' conduct constitutes racketeering activity under Colo. Rev. Stat. § 18-17-103(5)(b)(II), because such acts permitted Defendants to obtain and/or retain money by false pretenses or misrepresentations with the intent to permanently deprive LifeTech of its property, and thereby constituted theft in violation of Colo. Rev. Stat. § 18-4-401.

194. Defendants committed wire fraud in violation of 18 U.S.C. § 1343 as listed under 18 U.S.C. 1961(B) by making false statements to LifeTech in order to get it to invest in the Equipment.

195. As described above, Defendants made numerous false statements to LifeTech by use of email, texts, or interstate phone calls.

196. The emails and texts, and wire transfers, conducted by Defendants also constitutes racketeering activity under Colo. Rev. Stat. § 18-17-103(5)(b)(III), because such acts involved access of computers, computer networks, or computer systems for the purpose of devising or executing a scheme or artifice to defraud, and/or to obtain and/or retain money by false pretenses or misrepresentations, thereby constituting computer crimes under Colo. Rev. Stat. § 18-5.5-102.

197. Defendants' conduct constitutes racketeering activity under Colo. Rev. Stat. § 18-17-103(5)(b)(XIII) because such acts constitute offenses relating to controlled substances in violation of Colo. Rev. Stat. § 18-18-414.

198. These predicate acts were performed by, at the direction of, and/or were foreseeable to the Defendants, and conducted for the purpose of using subterfuge, deceit, misinformation, and dishonest means to acquire Plaintiff's property.

199. Defendants committed and caused to be committed a series of overt predicate acts of racketeering in furtherance of their conspiracy, including but not limited to the acts described in this Complaint.

200.    Defendants' pattern of racketeering consisted of multiple acts of racketeering by Defendants. The activities of Defendants were interrelated, not isolated, and were perpetrated for the same or similar purpose by the same persons.

201.    The activities occurred in Colorado within the last ten years (as well as in Utah).

202.    The conduct of Defendants constitutes racketeering activity as defined in Colo. Rev. Stat. § 18-17-103(3), (5).

203.    Plaintiff's property has been injured as a result of the enterprise's violations of COCCA.

204.    Plaintiff has suffered damages to be proven at trial.

205.    Plaintiff is entitled to damages proximately caused by the violation of COCCA by Defendants.

206.    Plaintiff is entitled to treble damages, interest, and reasonable attorneys' fees and costs under COCCA.

207.    Pursuant to Colo. Rev. Stat. § 18-17-103, Plaintiff is entitled to treble damages, plus interest, attorneys' fees, and costs.

208.    The acts of Defendants were attended by circumstances of fraud, malice, or willful and wanton conduct entitling Plaintiff to exemplary damages under Colo. Rev. Stat. § 13-21-102(1)(a).

## FOURTEENTH CAUSE OF ACTION
**Violation of Colorado Consumer Protection Act-Colo. Rev. State § 6-1-101 et seq.-All Defendants**

209.    LifeTech realleges and incorporates herein each of the averments set forth above.

210.    Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes making "false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions." COLO. REV. STAT. § 6-1-105(1)(b), (e).

211.    The CCPA further prohibits "represent[ing] that goods … are of a particular standard, quality, or grade … if he knows or should know that they are of another," and "advertis[ing] goods … with intent not to sell them as advertised," and failing "to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105(1)(l), (u). 203.

212.    Each Defendant is a "person" within the meaning of COLO. REV. STAT. § 6-1-102(6). 204.

213.    In the course of Defendants' business, they made false and misleading statements concerning the equipment and their business, as listed above.

214.    Accordingly, Defendants engaged in unlawful trade practices prohibited by the Colorado Consumer Protection Act.

215.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

216.    Defendants' conduct proximately caused injuries to Plaintiff.

217. Defendants' material misstatements and omissions were intended to, and had the capacity to deceive consumers, to attract consumer's to Defendants' services, and to induce a party to act or refrain from acting.

218. Plaintiff was induced to act or refrain from acting by Defendants' false and misleading statements and omissions.

219. Plaintiff was injured as a result of Defendants' conduct.

220. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions

**FIFTEENTH CAUSE OF ACTION**
**Civil Theft-All Defendants**

221. LifeTech realleges and incorporates herein each of the averments set forth above.

222. This claim for relief is made pursuant to Colo. Rev. Stat. § 18-4-405.

223. As described above, Defendants knowingly obtained and exercised control over Plaintiff's property by deception and concealing of or misrepresenting material facts known to Defendants but not known to Plaintiff.

224. Defendants acted with the intent to permanently deprive Plaintiff of its property.

225. Defendants knowingly and wrongfully obtained control of the assets of Plaintiff without authorization.

226. Defendants misappropriated Plaintiff's assets, through the acts described above, for themselves.

227. Despite demands, Defendants have refused to return such funds and assets.

228. Defendants committed civil theft, and as a direct and proximate result, the Plaintiff has incurred damages in an amount to be proven at trial.

229. Pursuant to Colo. Rev. Stat. § 18-4-405, Plaintiffs is entitled to treble damages, plus interest, attorneys' fees, and costs.

**SIXTEENTH CAUSE OF ACTION**
**Rescission**

230. LifeTech realleges and incorporates herein each of the averments set forth above.

231. As an alternative remedy, Lifetech is entitled to rescind any and all agreements between LifeTech and Defendants.

232. Defendants fraudulently induced LifeTech to enter into the agreements by making the following misrepresentations:

    a.    The Equipment had the capacity to process the amount of hemp represented;

    b.    That the same of similar equipment sold by Defendants to others had the ability to process the amount of hemp represented;

    c.    Defendants had contracts for the processing of hemp to keep the Equipment busy for two years;

    d.    Defendants were capable of delivering the Equipment when promised;

    e.    Defendants were capable of providing processing amounts as promised;

    f.    The bill of lading was accurate, real, and properly issues when it was actually fabricated; and

    g.    The Equipment had shipped when represented.

233.     As a result, LifeTech is entitled to a return of all money it paid for the equipment, as well as damages based on actions taken in reliance in entering into he agreements, in an amount to be established at trial.

**DAMAGES**

234.     Plaintiff is entitled to recover from Defendants the following:

a.     $1,950,000 from a lost customer contract;

b.     $13,110,000 from a lost customer contract;

c.     $267,157.50 from lost profits from outsourcing processing;

d.     $943,504 in wasted facility and set up expenses;

e.     $30,000,000 from lost extraction, or alternatively $5,000,000 from lost extraction to be provided by Defendants;

f.     Costs of engineering and installation of the Equipment in an amount to be determined at trial;

g.     Costs to modify the Equipment in an amount to be determined at trial;

h.     $37,125 per month in rent and $3,970 per month in CAMS on an ongoing basis;

i.     $250,000 in post-refinement work under the Revised Agreement;

j.     Restitution of monies paid to Defendants;

k.     Punitive or exemplary damages;

l.     Prejudgment interest; and

m.     Attorney fees.

## JURY DEMAND

LifeTech demands a trial by jury of all issues in this action that are triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, LifeTech demands judgment against each of the Defendants as requested above, and for such other relief as the Court deems equitable and just.

DATED this 24th day of May, 2021.

SAGE LAW PARTNERS, LLC


_/s/ Ryan M. Nord_
Ryan M. Nord
_Attorneys for Plaintiff_